UNITED STATES DISTRICT COURT
for the Western District of North Carolina
Charlotte Division

Case no.: 3:18-CV-299

| | |
|---|---|
| **RENDÉ D. BEAUFORT,** | |
| **Plaintiff,** | |
| vs. | **COMPLAINT** |
| **LPL FINANCIAL CORPORATION,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

The Plaintiff, Rendé Beaufort, being duly sworn, deposes and says the following:

## I.

## NATURE OF ACTION

This civil action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et. seq.* (hereinafter referred to as "Title VII"), and 42 U.S.C. Section 1981. This action has been initiated in order to seek appropriate relief on behalf of the Plaintiff, Rendé Beaufort. Plaintiff alleges that while employed by the Defendant, she was subject to a hostile work environment and disparate treatment because of her race and/or sex. Plaintiff seeks equitable and monetary relief in the form of present and future lost wages, compensatory damages for emotional distress, and punitive and/or liquidated damages as provided by law.

1

## II.

## PARTIES & JURISDICTION

1. Plaintiff is a citizen and resident of the City of Charlotte, County of Mecklenburg, State of North Carolina.

2. At all times relevant herein, Plaintiff has been a Black Female.

3. Defendant LPL Financial Corporation ("LPL" or "the Company") engages in investment advisor services and is a business incorporated in the State of California. LPL is an employer engaged in business, and operated, in the City of Fort Mill, York County, South Carolina. LPL has so been established for more than six (6) months next preceding this action.

4. At all times alleged herein, the Defendant, was and continues to be engaged in an industry affecting commerce and is an "employer" and/or a "covered employer" within the meaning of Title VII, Section 1981, inasmuch as it regularly employs over 500 employees.

5. This Court has jurisdiction over the parties and subject matter of this Complaint.

6. All procedural prerequisites the filing of this civil action have been fulfilled.

## III.

## NATURE OF CLAIM

This is a proceeding for declaratory and injunctive relief and for damages against Defendant, LPL Financial Corporation (hereinafter "Defendant"), to redress the deprivation of rights secured to Plaintiff by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Plaintiff seeks a declaratory judgment and injunction to restrain Defendant from maintaining practices, policies, customs and usages which discriminate against Plaintiff and members of the class that she represents because of her race and sex, with respect to hiring, placement,

2

promotions, compensation and other conditions of employment.  Plaintiff further seeks equitable and monetary relief in the form of present and future lost wages, compensatory damages for emotional distress, and punitive and/or liquidated damages as provided by law.

## IV.

## JURISDICTION

The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343 (4), Title VII and the principles of pendant jurisdiction. Jurisdiction to grant injunctive and declaratory equitable relief as well as damages is invoked pursuant to 42 U.S.C. § 2000e-5(f) and (g). The amount in controversy exceeds Fifty Thousand Dollars ($50,000).

## V.

## STATEMENT OF FACTS

**A. Plaintiff's Employment with Defendant.**

1. Plaintiff first became employed by Defendant as a Service Center Associate in Fort Mill, South Carolina, in December of 2012. Plaintiff's starting salary was $41,000.00.

2. Plaintiff remains employed by Defendant, and has been so at all times relevant to this matter. Currently, Plaintiff is a Service Center Manager earning approximately $61,000.00.

3. Plaintiff's professional duties include the following "Essential Functions":

    - Handle Financial Advisor immediate escalations needing management contact and advanced support issues.

    - Monitor, coach, set performance goals, and motivate staff.

- Help frontline agents with question from advisors and office staff. Assist in the training process of support staff. Track their training progress and decide when they have reached milestones to move them on the next level of training.
- Administrative management duties: timecard approvals, interviews, review time off requests, track attendance etc.
- Ensure proper escalation of incidents following escalation procedures. Coach staff on proper escalation to internal departments.
- Advise AVP/VP when there is a need for progressive counseling of a Service Professional. Assist in writing and presenting the action plan and guidance to improve the Service Professional's performance.

4. Plaintiff at all relevant times received at least satisfactory performance evaluations related to her employment.

**B. Plaintiff begins to experience disparate treatment due to her race and/or sex.**

5. Shortly after Plaintiff began her employment in 2012, Defendant hired another associate, Jerry Bowman (Black Male). Mr. Bowman was Plaintiff's peer associate on her work team.

6. In 2013, Plaintiff filed a Human Resources ("HR") complaint with Defendant, against the same employee, Jerry Bowman. Mr. Bowman would send the Plaintiff inappropriate messages through the internal messenger system. When Mr. Bowman's texts continued, Plaintiff turned to HR for help. HR directed Mr. Bowman to keep his distance from the Plaintiff. This was uncomfortable for her because they worked on the same floor and he would still make faces, smirk, and get on the elevator with Plaintiff. She eventually moved to another floor due to a promotion.

4

7. In the Spring of 2015, Plaintiff was being vetted for a manager position. At that time, Plaintiff was in the dual role of already managing the very process that a manager was being sought out for. Despite this, Defendant gave the position to a White Female, Allison Hillman. Upon information and belief, Ms. Hillman was known as a low-performing manager. Defendant subsequently terminated Ms. Hillman.

8. Since April 2015, and continuing, Defendant has treated Plaintiff and other Black Female employees differently than similarly-situated White Male co-workers.

    a. In November of 2017, Natisa Wright, a Black Female, manager who has same licenses as other men in same role but receives less pay than the Plaintiff. She was put through more complex interviews when she applied for the position as manager even after the AVP decided to offer her the position. Greg Gavin, VP (White Male) was responsible for blocking this hiring with no reason given.

    b. Joy Manley (formerly Barrow) a Black Female, has encountered the same gender biases. Joy is a phenomenal employee that speaks well and knows her job. There was a manager position that came open in her department that she was well qualified for and LPL hired a Male from the San Diego office and he moved to Fort Mill. Joy was qualified and already had a rapport with the team.

    c. Renea Milton a Black Female and a manager on the Operational side had a White Male supervisor who was leaving the department. Renea hired a Black Female to fill that position, Renea attempted to get the same pay for the supervisor coming on board as the White Male. She had to write a statement to HR to support her reasons. There was a bump in pay but not what she initially requested or what the previous supervisor was making.

9. In October of 2016, Plaintiff applied for a position as a Fraud Investigations Unit analyst. The position required extensive fraud experience, which Plaintiff had. She was not even interviewed for the position. Instead, the position was offered to Jacob McCaskill (White Male). Mr. McCaskill had no prior experience with fraud, yet he was selected over Plaintiff.

10. In 2016, Plaintiff applied for a Transitions Support Partner. Like before, Plaintiff was already completing the required tasks of the position, including assisting with conversions and training. Plaintiff was interviewed but was still turned down without being given any reason. An Asian Female was given the position. They told the Plaintiff to apply at a later time when other opportunities became available.

11. The 3rd floor of Defendant's work site consists of predominantly Black associates. During a manager's meeting on July 25th, 2017, Ramonette Belen (Asian Female) Assistant Vice President, twice remarked that she was not happy about moving to the "Section 8" 3rd floor. Upon information and belief, Ms. Belen was referring to the 3rd floor which is predominantly Black, and therefore, a less desirable floor, and somehow associated with low income housing.

12. Another LPL associate, Tiffany Butler (Black Female) was a part of a Virtual Administrative Services (VAS) pilot that transitioned into a permanent role, after she worked in the position for a year. Tamela Smith, an associate on the Plaintiff's team with no VAS experience was interviewed and offered the position with a $1900 increase. Tamela decided not to accept the offer. Tiffany Butler ended up receiving the position, however, she did not accept the initial offer of $1300, she counter offered for more. Her manager, Tyler Figueroa a White Male, told her that he did not think they would accept.

Tiffany still insisted that he ask. Days later Tiffany received an email from HR informing her of her new pay which was the initial offer she declined. Tiffany requested a meeting with Tyler. Tyler avoided Tiffany by saying he had meetings and could not meet with her. Tiffany filed a complaint with HR to see what her options were because she did not accept the offer. Tiffany expressed to HR that this action is similar to fraud. They told her that it was not and there was nothing she could do. They suggested that she continue to do well in the role and she could post out at a later time.

13. In November of 2017, an LPL associate on the Plaintiff's team, Adam Broel (White Male) was designated outside of the chain of command by Greg Gavin, VP (White Male) to develop a departmental telephone guide. Mr. Gavin also sought out another White Male on another team and did not inform the manager who is a Female. Plaintiff was never consulted about Mr. Broel's role with the guide, and he turned out to be a bad choice for the role. Plaintiff had to assist Mr. Broel and give constant direction for completion. Despite Plaintiff's efforts to help, the telephone guide was never completed.

14. Mr. Gavin is known to not promote women. There have been several complaints filed against him. Jill Hayes was a Hispanic Female Manager who oversaw the implementation of the Virtual Administrative Services pilot program. Just before the program was started, a White Male was placed over the program, again with no specific reason given. He also blatantly told a White Female employee Emily Caton that she would never be an Assistant Vice President as long as he worked there.

15. Mr. Gavin will promote White Men even if they are not qualified. Clay Compton was a White Male who had no previous experience in the Company's field. Mr. Compton was a

7

retail worker prior to being hired. Within 3 years Mr. Gavin had promoted him to Assistant Vice President.

16. On or about November 6, 2017, LPL associate Anthony Sutton (Black Male) was transitioned to Plaintiff's team as a subordinate.

17. On Friday, November 10th, Plaintiff sent Mr. Sutton, and other associates, an email providing contact information for management, which included Plaintiff. Mr. Sutton then called Plaintiff's work mobile number. When Plaintiff did not respond, Mr. Sutton sent a text asking Plaintiff to get in touch with him.

18. On November 13th (Monday) when Plaintiff had not responded directly to Mr. Sutton, he asked her in a disrespectful and demeaning tone if she saw his text. Mr. Sutton also asked why she did not respond as if she were a child or expected to respond immediately.

19. Plaintiff continued to perform her as duties as Manager and tried to work with Mr. Sutton despite his hostility towards her.

20. On November 29th, 2017, Mr. Sutton missed an assigned training. Plaintiff followed up with Mr. Sutton about his missed training, and he became rude and aggressive towards Plaintiff. Plaintiff issued a written warning to Sutton related to their communication. This was reported to the Assistant Vice President, Michael Brooks.

21. On December 1st, Plaintiff contact HR for guidance about the situation with Mr. Sutton. Plaintiff told HR that his behavior was unstable and Plaintiff felt unsafe around him. Upon information and belief, Sutton confirmed Plaintiff's version of events to HR. (**See Exhibit 1, Email communication trail between Plaintiff and HR.**)

22. HR investigated Plaintiff's complaint but failed to remove Mr. Sutton to another team. HR responded by saying that Sutton's actions were not enough to terminate him because

he did not use profanity and his actions were not threatening. Defendant again sided with another associate who was causing trouble, instead of protecting Plaintiff.

23. On December 5th, Plaintiff and Sutton met with HR, and Sutton was asked to sign paperwork describing the events, to go in his personnel file. No other action was taken against Sutton. Just a few days later, Mr. Sutton became rude and aggressive again, this time towards another LPL associate.

24. Plaintiff continued to work as Sutton's Manager. On December 7th, a tenured LPL associate Tamara Freeman, a Black Female who was on the team who had issues with Sutton and contacted HR to express similar concerns. The Plaintiff had paired Sutton with Freeman for training purposes. Ms. Freeman was not able to locate Sutton a few times during that day. Later that day Plaintiff spoke to Sutton to let him know that skipping training was unacceptable. He then stood up and in Plaintiff's face saying "aight and okay" with his hands in her face. Plaintiff told him that this would be a verbal warning and he walked away.

25. The very next day Sutton was sitting with Ms. Freeman again and he was not engaged. Ms. Freeman asked him if everything was okay. Ms. Freeman ended up telling Sutton to work at his desk doing self-paced training. Sutton then became loud and in her face acting aggressively.

26. On December 12th, Plaintiff paired Sutton with a White Male LPL associate, Adam Broel. While the three (3) associates were standing together at the work site, Sutton came up behind Plaintiff, and began touching her shoulder. During the touching, Sutton told Plaintiff that he will be the top performer on the team. Sutton's unwanted touch went from Plaintiff's shoulder, down to the back of her arm, then back up to her shoulder

again. Plaintiff moved her arm from Mr. Sutton's reach and moved to the other side of the group.

27. On December 14th, Plaintiff reported Sutton's unwanted physical touching to the Assistant Vice President, Michael Brooks. That AVP contacted HR to report Sutton's actions. HR responded that they needed to speak with Teresa Propper, an AVP in Employee Relations, but that Sutton would not be terminated, but moved to another team on the same floor, because he did not "aggressively grope" Plaintiff.

28. On December 19th, Teresa Propper contacted Plaintiff about the interaction with Sutton. Plaintiff let Ms. Propper know that she was not pleased with Nancy Philips stating that because he did not grope her aggressively there was not a reason to terminate. Mr. Sutton was moved to another team on the same floor. Mr. Sutton left his position at LPL earlier this year.

29. Around this time in a conversation with Tracy Parson, a Black Female and an AVP in Specialized Services, Plaintiff found out that Mr. Sutton had a past of harassing women at LPL. In fact, that was why he was transferred to Plaintiff's team in the first place. In his previous position at LPL, Sutton was disciplined for sexual harassment of another LPL associate while on Ms. Parson's team. No one discussed Sutton's past with Plaintiff, placing her in a potentially dangerous situation. When the harassment started, HR should have taken quicker and more decisive action to ensure Plaintiff's safety at work.

30. Plaintiff continues to see other associates, more often White Males, get chosen for positions that Plaintiff is uniquely qualified for. Though Plaintiff has risen through the ranks to management, she has been denied promotional opportunities because of her race (Black) and sex (Female). Plaintiff knows that Defendant pays at least three (3) other

10

White managers more than it pays Plaintiff. Specifically, Tyler Figueroa and Aaron Patterson (both White Males) and Christina Kirgan (White Female) are both comparable-level LPL managers, with similar professional experience, that get paid more than Plaintiff.

C. <u>**Plaintiff files a Charge of discrimination with the EEOC.**</u>

31. On March 7, 2018, Plaintiff filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission, styled, *Rendé D. Beaufort v LPL Financial Corporation*, EEOC Charge No. 433-2018-01396. In her charge of discrimination, Plaintiff alleged that she has been discriminated against and has been denied promotional opportunities and other benefits because of her race and/or sex, in violation of Title VII. (**See Exhibit 2, EEOC Charge of Discrimination dated 3/7/18**)

32. On March 9, 2018, the EEOC issued its Dismissal and Notice of Rights in connection with EEOC Charge No. 433-2018-01396. Plaintiff received said Notice on or about March 12, 2018. (**See Exhibit 3, EEOC Right to sue letter.**)

33. Plaintiff has timely initiated this action pursuant to Title VII. All procedural prerequisites to the filing of the instant action have been fulfilled.

**CLAIM FOR RELIEF**

**(Violation Title VII – Race and/or Sex Discrimination and Hostile Work Environment)**

1. As a direct and proximate result of Defendant's acts, Plaintiff has suffered, and continues to suffer present and future pecuniary losses, including, but not limited to loss of wages and other benefits. In addition, Plaintiff has sustained, as a direct and proximate result of Defendant's actions, damages in the form of emotional distress, including, but not limited

11

to humiliation, embarrassment, loss of professional standing, sleeplessness, anxiety, and depression, including physical manifestations of emotional distress. Accordingly, Plaintiff is entitled to have and recover of the corporate Defendant compensatory damages in an amount to be proved at trial in excess of Fifteen Thousand Dollars ($15,000.00). (**See Exhibit 4, Plaintiff's Medical Records**)

2. The Defendant's acts and omissions have been and continue to be willful and intentional and have been committed with malice and/or a reckless indifference to Plaintiff's federally-protected rights. Accordingly, Plaintiff is entitled to have and recover of the corporate Defendant punitive damages in an amount to be proved at trial in excess of Fifteen Thousand Dollars ($15,000.00).

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests the Court to:

1. Grant a permanent injunction enjoining the Defendant from engaging in unlawful employment practices, including race and sex discrimination, which violate Section 1981 of Title VII;

2. Order the Defendant to make the Plaintiff whole by providing her with equitable and compensatory damages in an amount in excess of Fifteen Thousand Dollars ($15,000.00) for the loss of past, present, and future lost wages and other benefits, as well as for her emotional distress, anxiety, and humiliation caused by the acts of the Defendant;

3. Order the Defendant to pay to the Plaintiff punitive damages as provided by federal law in amounts to be proved at trial exceeding Fifteen Thousand Dollars ($15,000.00);

4. Award Plaintiff the costs of this action together with reasonable attorney's fees as provided in § 706(k) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(k); and

5. Grant such further and different relief to the Plaintiff as the Court deems necessary and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial regarding the matters alleged herein.

This the 7th day of June, 2018.

s/Anna N. Westmoreland
Attorney for the Plaintiff
Anna N. Westmoreland, L.L.P.
13850 Ballantyne Corporate Place, Suite 500
Charlotte, North Carolina 28277
Phone: 704-334-1221
Facsimile: 704-334-1414
E-mail: anna@westmorelandlegalnc.com